LEE LITIGATION GROUP, PLLC
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
148 West 24th Street, 8th Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiff and the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————

LUCIA MARETT,
*on behalf of herself and all others similarly situated*,

      Plaintiff,

          -against-

METROPOLITAN TRANSPORTATION
AUTHORITY, and NEW YORK CITY TRANSIT
AUTHORITY,

      Defendants.

———————————————————————

Case No.:

**CLASS ACTION COMPLAINT**

Plaintiff, LUCIA MARETT (hereinafter, "Plaintiff"), on behalf of herself and others similarly situated, by and through her undersigned attorney, hereby files this Class Action Complaint against Defendants, METROPOLITAN TRANSPORTATION AUTHORITY and NEW YORK CITY TRANSIT AUTHORITY (hereinafter, "Defendants"), for violations of Title II of the Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation Act of 1973, and the New York City Human Rights Law ("NYCHRL"), and states as follows:

## INTRODUCTION

1.      This class action seeks to end the civil rights violations committed by Defendants against the blind and visually impaired, who seek to fully enjoy New York City Access-A-Ride Paratransit Service (hereinafter "Access-A-Ride" or "AAR").

2.      Paratransit is the term used for a "demand-response" service in which an eligible customer reserves a trip in advance to a destination within the service area covered by public buses and subways. The Americans with Disabilities Act (ADA) requires that individuals with disabilities who are unable to use accessible mass transit for some or all of their trips must be provided with paratransit. 42 U.S.C. § 12143. The implementing regulations regarding paratransit services are set forth in 49. C.F.R. § 37.121-155.

3.      AAR is a shared-ride, door-to-door or feeder service that provides paratransit services to tens of thousands of passengers in New York City on a daily basis. The program was operated by New York City's Department of Transportation until 1993 and is currently run by the Metropolitan Transportation Authority.

4.      Plaintiff, who currently lives in New York City, is a legally blind individual. She brings this civil rights class action against Defendants for failing to provide paratransit service that is fully accessible to, and independently usable by, blind and visually impaired people.

5.      Approximately 8.1 million people in the United States are visually impaired, including 2.0 million who are blind.  There are approximately 400,000 visually impaired persons in New York State.  Many of these individuals require verbal cues, audible announcements, physical assistance and/or other accommodations to fully enjoy transportation services provided by Defendants. Just as buildings that are only accessible by walking up stairs bar and exclude people who use wheelchairs, paratransit services that do not provide audible signaling, advance

warnings of arrival times, or appropriate door-to-door physical assistance exclude individuals who are blind or visually impaired.

6.      While waiting for their reserved Access-A-Ride vehicle to arrive, seeing individuals can independently identify and locate their AAR vehicles on the road and choose to either continue to wait at a comfortable, safe location, or board accordingly. However, blind individuals like Plaintiff are regularly denied the opportunity to use AAR comfortably and safely. Plaintiff frequently experiences long delays and missed pick-up times when using AAR. When AAR vehicles arrive for pick up, drivers do not call out names of customers or provide appropriate assistance with boarding. Plaintiff and other blind individuals must rely on sighted companions to help them identify their AAR vehicles. Many AAR drivers do not speak English and rely on customers' visual gestures to "flag down" or "wave down" AAR vehicles. Based on Plaintiff's experience, most of the time AAR vehicles arrived at the wrong pick-up location and only waited for five minutes. Plaintiff has made at least 100 complaints through AAR's comment line and customer care line. However, the aforementioned problems remained, and Plaintiff was still denied the opportunities to enjoy the AAR service provided by Defendant.

7.       By failing to ensure that verbal announcements and/or physical assistance are provided to blind passengers of Access-A-Ride, Defendants are violating basic equal access requirements imposed by federal and local law.

8.      As a result, blind individuals continue to be excluded from the Defendant's AAR program. Defendants are in violation of Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and the New York City Human Rights Law.

## JURISDICTION & VENUE

9.      Under 28 U.S.C. §§ 1331 and 1343, this Court has jurisdiction over claims arising

under the ADA and Section 504.

10.     Under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the NYCHRL claim. Venue is proper pursuant to 28 U.S.C. §1391(b) because the claims arose in this District and all the parties reside in this District.

11.     Human rights claims are not tort actions under 50-e and are not personal injury, wrongful death, or damage to personal property claims under 50-i. Nor do we perceive any reason to encumber the filing of discrimination claims. Accordingly, we conclude that there is no notice of claim requirement here. *Margerum v. City of Buffalo*, 2015 NY Slip Op 01378, ¶ 3, 24 N.Y.3d 721, 730, 5 N.Y.S. 3d 336, 340, 28 N.E.3d 515, 519.

## PARTIES

12.     Plaintiff is and has been at all times material hereto a resident of New York County, New York.

13.     Plaintiff is legally blind and a member of a protected class under the ADA. Plaintiff is eligible for paratransit service under the ADA because of her vision impairment. 49 C.F. R.  § 37.123 (e)(1). Plaintiff frequently uses Access-A-Ride in New York City. Plaintiff is substantially limited in performing one or more major life activities, including but not limited to accurately visualizing her world and independently traveling by means of public transportation.

3.     Defendant METROPOLITAN TRANSPORTATION AUTHORITY (hereinafter "MTA") is a public benefit corporation chartered by the New York State Legislature in 1965 under the MTA Act, N.Y. Pub. Auth. Law § 1265. Defendant MTA is organized under the laws of the State of New York and headquartered at 25 Jamaica Avenue, Brooklyn, New York 11207. Its registered agent address for service of process is located at 2 Broadway, New York, NY 10004.

4

14.     The MTA is the largest transportation network in North America, serving a population of 15.2 million people in the 5000 square mile area covering New York City, Long Island, southeastern New York State, and Connecticut.

15.     As of February 25, 2015, the MTA had an operating budget of $13.9 billion.

16.     Defendant MTA New York City Transit ("NYC Transit") is a public benefit corporation pursuant to N.Y. Pub. Auth. Law § 1200 et seq.

17.     Defendant NEW YORK CITY TRANSIT AUTHORITY (hereinafter "Defendant NYCTA" or "NYC Transit") is a public benefit corporation established by N.Y. Pub. Auth. Law § 1204 that operates as MTA's subsidiary. Defendant NYCTA is organized under the laws of the State of New York and headquartered at 130 Livingston Street, Brooklyn, New York 11201. Defendant NYCTA is subordinate to Defendant MTA, as its governing board is comprised of Defendant MTA's governing board acting ex officio. N.Y. Pub. Auth. Law § 1201(1). Whatever the guise of Defendants' board members when they act to establish policies that discriminate against Plaintiff and the Class, they act according to the authority they have as both Defendant MTA and Defendant NYCTA board members.

18.     As of February 25, 2015, NYCTA had an operating budget of $10.6 billion.

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this case as a class action pursuant to Federal Rule of Civil Procedure Rule 23, in that the class is so numerous that joinder of all members is impracticable F.R.C.P. Rule 23(a)(1), there are questions of law and fact common to the class F.R.C.P. Rule 23(a)(2), the claims and defenses of the representative party is typical of those of the class F.R.C.P. Rule 23(a)(3), and Plaintiff (as a representative party) will fairly and adequately protect the interests of the class F.R.C.P Rule 23(a)(4).

20.     Pursuant to the F.R.C.P. Rule 23(a), (b)(1), (b)(2), and (b)(3), Plaintiff brings this action as a class action on behalf of herself and all others similarly situated ("Class Members") as members of the Class, defined as follows:

> All visually impaired individuals in New York City who have been and/or are being denied opportunity to participate in or benefit from the aid, benefit or service provided by Defendants' Access-A-Ride, during the relevant statutory period.

21.     Excluded from the Class are: Defendants, their employees, their legal representatives, assigns, and successors, any entity which owns/controls Defendants and its agents and assigns, and any entities in which Defendants have a controlling interest. Also excluded is the Judge to whom this matter has been assigned, including the Judge's immediate family.

22.     Plaintiff reserves the right to revise the Class definition based upon facts learned in the course of litigating this matter and through the discovery process.

23.     Thus, the Class Members to be represented by Plaintiff consist of visually impaired individuals nationwide. As such, the Class is so numerous that a joinder of each individual member is impracticable; F.R.C.P. Rule 23(a)(1).

24.     Plaintiff is a representative of the Class due to the fact that she suffers from a qualified disability, in that she is visually impaired.

25.     Defendants have discriminated against Plaintiff and the members of the Class by denying blind or visually impaired individuals the opportunity to fully enjoy the services of Access-A-Ride.

26.     The questions of law and fact relating to the representative Plaintiff are similar and common to the law and fact questions which would be raised by other members of the Class if they were individually named plaintiffs herein.

27.     Similarly, the claims and defenses to be raised by and against the parties herein are typical of the claims or defenses which would be raised by the members of the Class if they were a party to this action.

28.     Plaintiff seeks injunctive relief for the implementation of the accommodations required under the ADA, which is the same relief which would be sought by each class member if he or she brought a claim individually. Accordingly, Plaintiff (as a representative party for the Class) will fairly and adequately protect the interests of the Class.

29.     The relief sought herein is for the benefit of all members of the Class and consistent injunctive relief should be provided for each member of the Class.

30.     Absent this matter being pursued as a Class Action, most of the Class Members would find the cost of litigating their claims to be prohibitive and would have no effective remedy.

31.     Further, prosecution of this matter by individual members of the Class would only create a risk of inconsistent and varying adjudications and the establishment of incompatible standards by the Defendants and adjudication which may be dispositive of the interests of the other Class members.

32.     This case arises out of Defendants' common policy and practice of denying blind individuals benefits or services provided through the Access-A-Ride program. Due to Defendants' policy and practice of failing to remove access barriers, blind persons have been and are being denied opportunity to enjoy the full services of the Access-A-Ride.

## **FACTUAL ALLEGATIONS**

### A.  **Paratransit is vitally important to people with disabilities living in, working in, or visiting New York City.**

33.     Paratransit is generally defined as a demand-responsive, door-to-door transportation service provided in sedans or lift-equipped vans. Unlike fixed-route service in which

the local jurisdiction determines the level of service based on many factors, including demand, fare revenues, availability of subsidies, other available transportation, etc., paratransit service criteria must be met, regardless of cost.

34.     Access-A-Ride is a shared-ride, door-to-door, or feeder paratransit service administered by the Metropolitan Transportation Authority (MTA) New York City Transit (NYCT). It is intended to be a form of public transportation that allows disabled passengers to travel around the city with specialized service and assistance other transportation does not provide. However, its original purpose has been poorly executed. Access-A-Ride is notoriously unreliable due to long delays and missed pick-up times. It also requires up to twenty-four hours advance notice, and thus fails to provide riders with disabilities the freedom of rapid, convenient travel that is such a vital part of living in, working in, and visiting New York City.

35.     Using a taxi for regular travel is not a viable option for people with disabilities. Taxis are significantly more expensive than paratransit, making them unviable as an everyday mode of transportation for many New Yorkers – especially those with disabilities, who are disproportionately likely to have limited income and economic resources.

**B.  Defendants failed to make Access-A-Ride Paratransit Service accessible for blind individuals.**

36.     Despite the federal regulation which mandates paratransit service for disabled individuals, blind and visually impaired individuals who reside in or travel to New York City are denied the opportunity to fully enjoy AAR service provided by Defendants.

37.     In 2015, the Federal Transit Administration ("FTA") issued a guidance that specifically addresses types of personnel training required for paratransit services:

- Drivers – Properly operating all accessibility equipment and features; *providing appropriate assistance to individuals with disabilities with boarding, alighting, and securement; communicating effectively with individuals with different types*

*of disabilities; making stop announcements and route identification announcements*; and positioning the bus so that the lift or ramp can be deployed and used.

- Vehicle mechanics – Maintaining all accessibility equipment on vehicles and keeping maintenance and repair records.

- Customer service agents, designated employees for responding to complaints, and call-takers – Communicating effectively with individuals with different types of disabilities; explaining the complaint-resolution process; and providing service information (e.g., routes, schedules, and fares) with special attention to the needs of individuals with disabilities.

- Vehicle dispatchers – Understanding all operating policies and procedures to effectively and properly assign and route vehicles, assisting drivers on issues that arise pertaining to accessible service, and communicating effectively with individuals with different types of disabilities.

- Managers and supervisors – Understanding all operating policies and procedures and supervising employees to ensure they provide proper and consistent levels of service to individuals with disabilities.

FTA, Circular C 4710.1 at § 2.9.1.

38.    Defendants failed to train their personnel to effectively assist visually impaired individuals to access AAR vehicles. When AAR vehicles arrive for pick up, drivers do not call out names of customers or provide appropriate assistance with boarding. Plaintiff and other blind individuals must rely on sighted companions help them identify their AAR vehicles. Many AAR drivers do not speak English and rely on customers' visual gestures to "flag down" or "wave down" AAR vehicles. Furthermore, most of the time AAR vehicles arrived at the wrong pick-up location and only waited for five minutes.

39.    Defendants are aware of the policies and practices needed to make AAR accessible for disabled individuals. On Defendant's official website, Defendants published a "Access-A-Ride Customer Bill of Rights." See attached **Exhibit A**. According to Defendants, "the purpose of this document is to clearly set forth AAR's current standards for providing excellent service to AAR

customers." The Access-A-Ride Customer Bill of Rights states that AAR customers are entitled to "safe, prompt and reliable service," "pick-ups within 30 minutes after the scheduled reservation time," "AAR Drivers who received training, under supervision, to meet the travel requirements of customers," "AAR Drivers who call out the name of the customer upon arrival at the pick-up location," "assistance door-to-door," and "receive a response to their complaint within 21 business days of submitting the complaint."

40.    Defendants thus provide accommodations, advantages, facilities, privileges, and services to passengers that contain access barriers. By failing to remove these barriers to make Access-A-Ride accessible to blind passengers, Defendants have denied Plaintiff and similarly situated blind passengers opportunity to participate in or benefit from the aid, benefit, or service provided by AAR.

41.    Defendants have engaged in acts of intentional discrimination, including but not limited to the following policies or practices:

a.    implementing and maintaining services that discriminate against members of the putative class and subclasses with knowledge of such discrimination; and/or

b.    implementing and maintaining services that are sufficiently intuitive and/or obvious as to constitute intentional conduct; and/or

c.    failing to act in the face of the substantial likelihood of harm to class and subclass members' rights protected under federal law.

42.    Defendants utilize standards, criteria or methods of administration that have the effect of discriminating or perpetuating the discrimination of others.

43.    Defendants are aware of means by which its existing services could be made accessible to blind individuals. The Office of New York City Comptroller's Annual Audit Report

from 2018 shows that there were 32,938 recorded AAR incidents, 86 percent of which were reported through the comment line. Plaintiff Lucia has contacted AAR countless times to report her negative experience and proposed solutions for AAR. However, Defendants failed to remediate AAR's accessibility barriers and continue to exclude Plaintiff and other blind individuals from accessing AAR's service.

44.    To remedy these harmful practices, Defendant must open the lines of communication between their disabled clients and the drivers of their vehicles, so that passengers are in control of their schedule and may communicate with drivers directly to learn their location, route, and/or estimated time of arrival. As shown repeatedly since its inception, the system by which passengers are forced to rely on dispatchers to communicate the locations of their drivers is both outdated and ineffective. Indeed, all other door-to-door transportation services available offer passengers the option to call their driver prior to their arrival (e.g. Uber, Lyft, and taxi services).

45.    In addition, or alternatively, Defendants should install a siren, bell, or other audio signal to every one of their vehicles for drivers to use to alert passengers of their arrival at the pre-determined meeting point.

**C.  Harm to Plaintiff**

46.    Plaintiff Marett is a legally blind New York City resident who started using Defendant's Access-A-Ride Paratransit Program approximately ten years ago. Plaintiff relies on AAR to commute to and from work, attend events and accomplish daily tasks. Plaintiff generally prefers Access-A-Ride to all other modes of transportation because it provides "door to door service." However, AAR's pervasive inaccessibility and unreliability results in significant delays and forces Plaintiff to frequently reroute her travel plans.

47.     Plaintiff's daily commute is significantly affected by AAR's inaccessibility. For the minimum five rides Plaintiff takes with AAR each week, three or four times AAR drivers meet her at a wrong location. AAR drivers frequently waited at the entrance of Plaintiff's apartment building's parking garage rather than the front entrance. Plaintiff has communicated this problem to AAR staff many times, and common sense would indicate that Plaintiff does not live in the parking garage, yet the pattern persists.

48.     For the one or two times a week that AAR drivers come to the right entrance to pick up Plaintiff, they often wait on the other side of the street and do not give Plaintiff any verbal notice of their arrival. Once, by waiting in front of her apartment building, where Plaintiff told the AAR dispatcher she would be, Plaintiff nonetheless missed her ride and was forced to accept a taxi authorization as compensation because the AAR driver stopped on the other side of the street without informing her or looking for her in the correct meeting place before driving away.

49.     When a taxi is authorized because of a missed pickup, AAR customers are responsible for paying the full fare plus any tolls and obtaining a valid receipt from the taxi driver for reimbursement. Access-A-Ride's dependence on taxi authorization compensation is counterproductive and unsustainable. Not only does it cost money that a rider may not be prepared to spend or currently have available, but it requires riders to hail a cab, which is difficult to do in many areas. There were many times when AAR failed to reimburse Plaintiff for her taxi authorization. For example, on March 27, 2016, Plaintiff requested reimbursement of her taxi authorization, but never received the reimbursement from AAR.

50.     Due to Plaintiff's visual impairment, Plaintiff is not able to identify vehicles independently and must rely on verbal announcement to know when her AAR vehicles have arrived. Plaintiff frequently experiences long delays and missed pick-up times when using AAR.

When AAR vehicles arrive for pick up, drivers do not call out names of customers or provide appropriate assistance with boarding. Plaintiff and other blind individuals must rely on sighted companions to help them identify AAR vehicles. Many AAR drivers do not speak English and rely on customers' visual gestures to "flag down" or "wave down" AAR vehicles. To avoid missing her rides, Plaintiff must rely on strangers standing nearby or the security guard in the lobby of her apartment building to help her identify AAR vehicles. Indeed, AAR dispatchers and drivers rarely notify Plaintiff the arrival of AAR vehicles and Plaintiff has to regularly rely on her security guard or sighted strangers. Because of AAR's lack of verbal notification, Plaintiff often had to wait outside of her building in inclement weather for more than half an hour, for fear that she would miss her ride. Because of the AAR's discriminatory practices, Plaintiff was often late for work and doctor's appointments, among others.

51.     In addition to the inconvenience and inaccessibility of AAR, Plaintiff also suffered from the general poor management of Defendants' Access-A-Ride Paratransit Service. On September 18, 2016, Plaintiff received a voice message from AAR informing her that her ride for the following morning will be cancelled for no reason. The voice message stated that if she wants to save her trip reservation, she needs to "hit 1." Because this was a voice message instead of a live call, Plaintiff was not able to "hit 1" and save her reservation. When Plaintiff called AAR the next morning, the agent on the phone told her that AAR could not help her restore her reservation until an agent listened to the tape to verify which party had cancelled the scheduled trip. The agent told Plaintiff that AAR would call her later, at 8:00AM, which was after the time that Plaintiff needed to be at work. The agent then offered Plaintiff a taxi authorization, which Plaintiff refused because there were many times Plaintiff did not receive reimbursement for taxi fare.

52.     Plaintiff has made roughly three complaints every week since 2012. However, the accessibility issues of AAR remain unchanged. Drivers have complained to Plaintiff about making turns to meet her at the requested location and have asked her and other blind riders to walk into, or through traffic to meet them. This process is particularly dangerous for AAR passengers who are blind or visually impaired. Blind riders should not be required to compromise their own safety and comfort to access AAR, which is a service originally designed to provide safe and comfortable transportation for people with disabilities in New York City.

53.     Because of Defendants' discriminatory practices, Plaintiff has suffered irreparable harm, including substantial numbers of significantly untimely pickups, substantial numbers of trip denials or missed trips, lack of boarding assistance, lack of verbal announcement upon the arrival of an AAR vehicle, and the inexcusable behavior of AAR's undertrained  support line staff, trip reservationists and drivers.

54.     Based upon the foregoing practices, Defendants have engaged in an operational pattern or practice that significantly limits the availability of service to ADA paratransit eligible persons who are visually impaired. Plaintiff suffered from discrimination not because of matters outside Defendants' control, but because of Defendants' discriminatory practices.

55.     Plaintiff sustained injury, including economic damages, emotional distress and the costs of bringing this action, due to Defendants' failure to accommodate blind passengers with accessible announcements and assistance through their AAR service.

## FIRST CAUSE OF ACTION
## Violation of Title II of the Americans with Disabilities Act and Its Implementing Regulations

56.     Plaintiff re-alleges and incorporates herein all previously alleged paragraphs of the Complaint.

57.    ADA requires municipalities to provide paratransit and other special transportation services to individuals whose disabilities do not permit them to use the regular fixed routes. 42 U.S.C.S. § 12143(c)(1). The level of this service must be comparable to that afforded riders who are not disabled. 49 C.F.R. § 37.3.

58.    A "public entity" includes state and local governments, their agencies, and their instrumentalities. 42 U.S.C. § 12131(1). The MTA and NYC Transit are public entities within the meaning of 42 U.S.C. § 12131 and 28 C.F.R. § 35.104.

59.    Section 37.131 (b) of 49 C.F.R. provides that "The entity shall schedule and provide paratransit service to any ADA paratransit eligible person at any requested time on a particular day in response to a request for service made the previous day. Reservations may be taken by reservation agents or by mechanical means."

60.    Section 37.131 (f) of 49 C.F.R. provides that "The entity shall not limit the availability of complementary paratransit service to ADA paratransit eligible individuals by any of the following: (1) Restrictions on the number of trips an individual will be provided; (2) Waiting lists for access to the service; or (3) Any operational pattern or practice that significantly limits the availability of service to ADA paratransit eligible persons. Such patterns or practices include, but are not limited to, the following: (A) Substantial numbers of significantly untimely pickups for initial or return trips; (B) Substantial numbers of trip denials or missed trips; (C) Substantial numbers of trips with excessive trip lengths."

61.    Defendants have engaged in an operational pattern or practice that significantly limits the availability of paratransit services to Plaintiff and other blind individuals, in violation of the ADA and 49 C.F.R. 37.131 (f)(3). Such patterns or practices include, but are not limited to: substantial numbers of significantly untimely pickups, substantial numbers of missed trips, lack of

boarding assistance for visually impaired individuals, lack of verbal announcement for visually impaired individuals and lack of training of support line staff, trip reservationists and drivers.

62.     Unless the Court enjoins Defendants from continuing to engage in these unlawful practices, Plaintiff and members of the proposed class and subclass will continue to suffer irreparable harm.

63.     Plaintiff is entitled to injunctive relief and reasonable attorneys' fees and costs. 42 U.S.C. § 12133.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

**SECOND CAUSE OF ACTION**
**Violation of Section 504 of the Rehabilitation Act of 1973**
**29 U.S.C. § 794 et seq.**

64.     Plaintiff re-alleges and incorporates herein all previously alleged paragraphs of the Complaint.

65.     Section 504 of the Rehabilitation Act of 1973 provides that "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794(a).

66.     Plaintiff and class members are otherwise qualified individuals with disabilities within the meaning of Section 504 in that they have impairments which substantially limit one or more major life activities, and have reason to and are otherwise eligible to participate in Defendants' AAR services. See 29 U.S.C. § 705(20)(B) (referencing 42 U.S.C. § 12102).

67.     Defendants MTA and NYC Transit are recipients of federal financial assistance within the meaning of Section 504 and have received such federal financial assistance at all times relevant to the claims asserted in this Complaint.

68.     Defendants MTA and NYC Transit are instrumentalities of the New York State government.

69.     All of the operations of Defendants MTA and NYC Transit are "program[s] or activit[ies]" within the meaning of the Rehabilitation Act. 29 U.S.C. § 794(b)(1)(A).

70.     The term "discrimination" as defined by Section 504 includes the failure to alter existing facilities used in the provision of designated public transportation services "in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs, upon the completion of such alterations." 42 U.S.C. § 12147(a).

71.     The U.S. Department of Transportation regulations implementing Section 504 provide that "[n]o qualified person with a disability shall, solely by reason of his disability, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity that receives Federal financial assistance administered by the Department of Transportation." 49 C.F.R. § 27.7(a).

72.     The prohibition on discrimination in the U.S. Department of Transportation regulations applies to "aid, benefit, or service provided under a program or activity receiving Federal financial assistance," including "any aid, benefit, or service provided in or through a facility that has been constructed, expanded, altered, leased or rented, or otherwise acquired, in whole or in part, with Federal financial assistance." 49 C.F.R. § 27.7(b)(6).

73.     Defendants have discriminated against and continue to discriminate against Plaintiffs by denying them the opportunity to participate in or benefit from the aid, benefit, or service offered through AAR. 49 C.F.R. § 27.7(b)(1)(i).

74.     Transit authorities supervising alterations that affect or could affect the usability of transit facility in whole or in part, such as the MTA and NYC Transit, must "make the alterations . . . in such a manner, to the maximum extent feasible, that the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs, upon the completion of such alterations." 49 C.F.R. § 37.43(a)(1).

75.     Defendants and their agents and employees have violated and continue to violate Section 504 and the regulations promulgated thereunder by excluding Plaintiff from participation in, denying Plaintiff the benefits of, and subjecting Plaintiff to discrimination based solely by reason of her disabilities in the benefits and services of Defendants' AAR program.

76.     As a direct and proximate cause of the aforementioned acts, Plaintiff and Class members have been and continue to be injured. Defendants' conduct constitutes an ongoing and continuous violation of Section 504. As a result, Plaintiffs are entitled to declaratory and injunctive relief, as well as reasonable attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### Violation of the New York City Human Rights Law
### (N.Y.C. Admin. Code § 8-101 et seq.)

77.     Plaintiff realleges and incorporates herein all previously alleged paragraphs in this Complaint.

78.     N.Y.C. Admin. Code 8-107(4)(a), provides that "[i]t shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation because of the actual or perceived…disability…status of any person directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof…"

79.     Pursuant to the NYCHRL, disability encompasses any impairment, regardless of whether the impairment substantially limits a person's ability to engage in major life activities. See id. § 8-102(16)(a) (defining disability as "any physical, medical, mental or psychological impairment, or a history or record of such impairment").

80.     The term "place or provider of public accommodation" encompasses "providers, whether licensed or unlicensed, of goods, services, facilities, accommodations, advantages, or privileges of any kind, and places whether licensed or unlicensed, where goods, services, facilities, accommodations, advantages, or privileges of any kind are extended, offered, sold or otherwise made available." N.Y.C. Admin. Code § 8-102(9).

81.     Public transportation services constitute a service, accommodation, advantage, or privilege that is offered to the general public within the meaning of N.Y.C. Admin. Code 8-102(9). Defendants MTA and NYC Transit act as "managers" of New York City's Access-A-Ride Paratransit Service in their role as public benefits corporation created by the City. Accordingly, Defendants are plainly "persons" within N.Y.C. Admin. Code § 8-102(1).

82.     Defendants' conduct violates N.Y.C. Admin. Code § 8-107(17), which states that "an unlawful discriminatory practice…is established…[when plaintiff] demonstrates that a policy or practice of a covered entity or a group of policies or practices of a covered entity results in a disparate impact to the detriment of any group protected by the provisions of this chapter."

83.     By failing to operate AAR program so that it is readily accessible and usable by people who are visually impaired, Defendants have demonstrated a policy or practice that has a disproportionately negative impact on members of the proposed class, each of whom qualifies as a protected group under the provisions of the NYCHRL.

84.    The violations at hand are particularly grave in light of the "uniquely remedial" purpose behind the NYCHRL, which provides that each section must be "construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those law with provisions comparably-worded to provisions of this title, have been so construed." N.Y.C. Admin. Code § 8-130.

85.    Accordingly, Defendants' conduct is subject to a much stricter standard than under state or federal law, and its liability under these provisions must be determined separately and independently from its liability under the disability provisions of either state or federal civil rights law.

86.    As a direct and proximate result of Defendants' violations of the NYCHRL, Plaintiff has been injured as set forth herein.

87.    Defendants' conduct constitutes an ongoing and continuous violation of the NYCHRL. Unless Defendants are enjoined from further violations, Plaintiff will continue to suffer injuries for which there is no adequate remedy at law. In particular, Plaintiff will suffer irreparable harm in that she will continue to be discriminated against and denied the accommodations, advantages, facilities, or privileges of the Access-A-Ride Paratransit Service as a whole, as well as accommodations that would provide her the opportunity to benefit from it.

88.    Thus, Plaintiff is entitled to injunctive relief and reasonable attorneys' fees and costs.

Wherefore, Plaintiff prays for relief as set forth below.

## FOURTH CAUSE OF ACTION

### Declaratory Relief

89.      Plaintiff re-alleges and incorporates herein all previously alleged paragraphs in this Complaint.

90.      Plaintiff contends that Defendants have failed and are failing to comply with applicable laws prohibiting discrimination against people with blindness and visual impairments affecting their capacity to see in violation of N.Y.C. Admin. Code § 8-101 *et seq.*

91.      A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and duties and act accordingly.

Wherefore, Plaintiff prays for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on her own behalf and on behalf of the Class Members, hereby demand judgment against Defendants and request the following injunctive and declaratory relief:

92.      The Court to certify this matter as a Class action on behalf of the Class defined above, appoint Plaintiff as the Class representative, and appoint the undersigned as Class counsel;

93.      The Court to issue a declaratory judgment that Defendants have violated the Plaintiff's and Class members' rights as guaranteed by the New York City Human Rights Law;

94.      A preliminary and permanent injunction requiring Defendants to develop and implement a remedial plan to make the Access-A-Ride Paratransit Service readily accessible to and usable by blind individuals over a reasonable period of time;

95.      For an order and judgment declaring that Defendants' acts and omissions as challenged herein are unlawful;

96.     Plaintiff's reasonable attorneys' fees, expenses, and costs of suit as provided by state and federal law;

97.     For pre- and post-judgment interest to the extent permitted by law; and

98.     For such other relief that the Court may deem just and proper.

DATED: May 31, 2019

**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
148 W 24th Street, 8th Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181

By: _____
                C.K. Lee, Esq.